UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and on Behalf of All Others Similarly Situated, 429 Mississippi Street Jackson, Mississippi 39201-1005,<br><br>            Plaintiff,<br><br>     v.<br><br>ROADRUNNER TRANSPORTATION SYSTEMS, INC., 4900 S. Pennsylvania Ave. Cudahy, Wisconsin 53110,<br><br>MARK A. DIBLASI, and c/o Roadrunner Transportation Systems, Inc. 4900 S. Pennsylvania Ave. Cudahy, Wisconsin 53110,<br><br>PETER R. ARMBRUSTER, c/o Roadrunner Transportation Systems, Inc. 4900 S. Pennsylvania Ave. Cudahy, Wisconsin 53110,<br><br>            Defendants. | Case No.<br><br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff, Public Employees' Retirement System of Mississippi ("Plaintiff"), alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Roadrunner Transportation Systems, Inc. ("Roadrunner" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Roadrunner common stock between May 2, 2013, and January 30, 2017, inclusive (the "Class Period").

2.     This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

3.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. § 77v).

5.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

6.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.     Plaintiff provides retirement, disability, and survivor benefits to employees of the State of Mississippi's public school districts, municipalities, counties, community colleges, state universities, and such other public entities as libraries and water districts.  Mississippi PERS has over $20 billion in assets under management.  Plaintiff's certification evidencing its transactions in the Company's stock during the Class Period is attached hereto as Exhibit A.

8.     Defendant Roadrunner, a Delaware corporation, is an asset-light transportation and logistics service provider, offering a suite of global supply chain solutions.  Roadrunner's principal executive offices are located at 4900 S. Pennsylvania Ave., Cudahy, Wisconsin 53110. Roadrunner's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RRTS."

9.     Defendant Mark A. DiBlasi ("DiBlasi") is the Company's chief executive officer ("CEO") and served as the Company's President from January 2006 until January 2016.

10.     Defendant Peter R. Armbruster ("Armbruster") has been the Company's Chief Financial Officer ("CFO"), Treasurer and Secretary since December 2005.

2

11.     Defendants in Paragraphs 9-10 are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of the federal securities laws.

13.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Roadrunner's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

3

14.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Roadrunner's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were the result of the collective actions of the Individual Defendants.

16.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Roadrunner common

4

stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Roadrunner's business, operations, management and the intrinsic value of its securities; and (ii) caused Plaintiff and other shareholders to purchase Roadrunner common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A. Material Misstatements and Omissions during the Class Period

17.     Roadrunner rapidly expanded its business through acquisitions while issuing public statements, press releases and SEC filings that touted the Company's rapid growth and reported financial results as an indicator of the successful implementation of its acquisition strategy.

18.     Among other things, Roadrunner's reported financial results during the Class Period: (a) improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; (b) improperly accounted for Company expenses; and (c) improperly accounted for existing balance sheet accounts. As a result of these and other improper accounting transactions, Roadrunner's reported expenses were materially understated during the Class Period, its assets were materially overstated, and its reported revenue and net income were materially inflated during the Class Period. Defendants failed to disclose that the Company's financial statements were not stated in accordance with generally accepted accounting principles, or "GAAP."

19.     The signed certifications of the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 certified, inter alia, that the Company's Class Period Forms 10-Q and Forms 10-K fairly presented Roadrunner's financial condition and that each had evaluated the Company's internal controls and found them to be effective. These certifications were materially

5

false and misleading because, at the times the Individual Defendants signed the statements, they were aware or recklessly disregarded that: (1) the Company's reported financial statements violated GAAP; (2) the financial statements materially misstated assets, revenues, net income and expenses; and (3) there were material weaknesses in the Company's internal controls that rendered the Company incapable of ascertaining its true financial condition.

20.     All of Defendants' GAAP violations and other materially false and misleading statements alleged herein during the Class Period misled the investing public about the true financial condition of the Company.

21.     Since before the beginning of the Class Period, the Company embarked on a reckless growth-through-acquisition corporate strategy by which the Company pumped-up its revenues artificially.  The Company made numerous acquisitions and used the accounting manipulations to mask artificial results.

22.     The Company's growth-through-acquisition corporate strategy was, in large part, an underlying cause of the ultimate failures in the Company's internal accounting controls and controls over financial reporting, giving rise to the January 30, 2017 announcement of accounting errors.

23.     After the close of business on May 1, 2013, Roadrunner issued a press release that reported financial results for the three months ended March 31, 2013.  This after-hours press release starts the Class Period.  In it, Defendant DiBlasi said:

> We achieved record revenues and operating income in the first quarter of 2013. These records were achieved in the lowest seasonal quarter of the year and in a quarter with fewer business days than normal.  Strong performance across all of our business segments generated first quarter revenue growth of 26.5% and net revenue growth of 33.8%.  Due to sales and operational initiatives, our operating income growth of 30.7% outpaced revenue.  Our operating ratio improved 20 basis points to 93.6%, compared to 93.8% in the first quarter of 2012, despite additional costs incurred for service initiatives implemented in our LTL segment

due to adverse weather conditions.  Additional costs incurred in our LTL segment for the weather-related service initiatives negatively impacted our first quarter diluted earnings per share by approximately $0.02.

Our LTL operating ratio improved sequentially to 93.2% in the first quarter of 2013 from 94.9% in the fourth quarter of 2012.  Our continued initiatives to expand into new geographic regions, build density, improve pricing, and enhance productivity, as well as the addition of Expedited Freight Systems (EFS) in August 2012, resulted in a net revenue margin improvement from 25.8% in the first quarter of 2012 to 28.5% in the first quarter of 2013.  We are pleased with the first quarter operating ratio, despite experiencing load inefficiencies due to the inclement weather.

Our continued performance initiatives led to our TL operating ratio improving to 93.4% in the first quarter of 2013 from 94.2% in the first quarter of 2012.  TL revenues grew by $48.5 million, or 49.5%, from the prior year quarter. Incremental revenues from our 2012 acquisitions accounted for $42.4 million of the increase, with the remaining $6.1 million representing organic growth of 6.2%.  The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 70.8% increase in our TL operating income quarter-over-quarter.

TMS revenue grew $0.8 million, or 3.7%, in the first quarter of 2013 from the prior year quarter.  Organic growth, pricing, and our late February 2012 acquisition of Capital Transportation Logistics accounted for the 3.7% increase. The operating leverage associated with this growth led to a 5.0% increase in TMS operating income quarter-over-quarter.  Our TMS operating ratio improved to 89.2% compared to 89.3% in the first quarter of 2012.

24.     On July 25, 2013, Roadrunner announced that it had acquired all of the outstanding membership interests of Marisol International LLC ("Marisol"), a leading supply chain provider of international logistics solutions based in Springfield, Missouri, for a total purchase price of $66 million, plus an earn-out capped at $2.5 million.  Defendant DiBlasi said, "As we have indicated, one of our key strategic objectives in 2013 is broadening our international capabilities to meet our customers' total transportation and logistics needs. … Marisol represents an ideal fit both strategically and culturally. … The addition of Marisol will enable us to provide a comprehensive, global supply chain solution to our combined customer base."  Scott Dobak, President of Roadrunner's TMS and LTL business segments, added, "[W]e

7

expect to realize synergies throughout our combined network resulting from the cross-utilization of the expanded services we can collectively bring to our customers."

25.     On July 31, 2013, Roadrunner reported financial results for the three and six months ended June 30, 2013.  Defendant DiBlasi, President and CEO of Roadrunner, said, Strong performance across all of our business segments generated second quarter revenue growth of 26.4% and net revenue growth of 35.6%.  Due to sales and operational initiatives, our operating income growth of 31.4% outpaced revenue.  Our operating ratio improved 30 basis points to 92.6%, compared to 92.9% in the second quarter of 2012.

> Our LTL operating ratio remained the same quarter-over-quarter and improved sequentially to 91.9% in the second quarter of 2013 from 93.2% in the first quarter of 2013.  Our continued initiatives to expand into new geographic regions, build density, improve pricing, and enhance productivity, as well as the addition of Expedited Freight Systems (EFS) in August 2012, resulted in a net revenue margin improvement from 25.8% in the second quarter of 2012 to 28.8% in the second quarter of 2013.
>
> Our continued performance initiatives led to our TL operating ratio improving to 93.0% in the second quarter of 2013 from 93.9% in the second quarter of 2012.  TL revenues grew by $50.2 million, or 45.2%, from the prior year quarter.  Incremental revenues from our 2012 and 2013 acquisitions accounted for $43.3 million of the increase, with the remaining $6.9 million representing organic growth of 6.2% from our existing business. The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 66.2% increase in our TL operating income quarter-over-quarter.
>
> TMS revenue grew $3.8 million, or 16.6%, in the second quarter of 2013 from the prior year quarter, primarily due to our 2013 acquisition of Adrian Carriers.  This growth, along with a $0.7 million contingent purchase price adjustment, led to a 43.4% increase in TMS operating income quarter-over-quarter.

26.     On August 15, 2013, Roadrunner announced that it had acquired certain of the assets of the Southeast drayage division of Transport Corporation of America, Inc. ("TA Drayage"), a provider of intermodal transportation and related services in the Southeast United States, for approximately $1.2 million, which was financed with Roadrunner's cash on hand.

Ben Kirkland, President of Roadrunner Intermodal Services ("RRIS"), said, "We will absorb the TA Drayage operations into our existing Southeast RRIS locations, and we look forward to supporting and expanding TA Drayage's strong customer relationships and service record as we pursue continued growth in the business." The press release added that during calendar year 2012, TA Drayage generated approximately $20 million in revenues, and that TA Drayage was expected to be accretive to Roadrunner's earnings in 2013.

27. On September 18, 2013, Roadrunner announced that it had acquired substantially all of the assets of YES Trans, Inc. ("YES"), a refrigerated truckload service provider based in Salisbury, Massachusetts, for approximately $1.2 million, net of cash acquired, plus an earn-out capped at $1.1 million, financed with Roadrunner's cash on hand. Brian Van Helden, President of Roadrunner's Truckload Logistics division, said, "We will incorporate the YES operations into our existing Massachusetts refrigerated location and are excited about the growth opportunities we collectively envision. We look forward to supporting and expanding YES' strong customer relationships and service record as we continue to grow the business." The press release stated that during calendar year 2012, YES generated approximately $5 million in revenues, and that YES was expected to be accretive to Roadrunner's earnings in the near term.

28. On October 30, 2013, Roadrunner reported financial results for the three and nine months ended September 30, 2013. Defendant DiBlasi said,

> The combination of strong organic and acquisition-related revenue growth led to a 30.1% increase in third quarter revenues and a 32.3% increase in net revenues over the third quarter of 2012. For the 2013 third quarter, our operating income growth of 31.4% continued to outpace our revenue growth. Our operating ratio improved 10 basis points to 93.5% from 93.6% in the third quarter of 2012.
>
> LTL revenues grew by $11.7 million, or 8.9%, from the prior year third quarter. Incremental revenues from our 2012 acquisition accounted for $3.1 million of the increase, with the remaining $8.6 million representing organic growth of 6.5%. Our organic growth during this year's third quarter was impacted by sluggish

9

economic conditions in which many customers experienced a decline in shipments compared to last year's quarter. Our LTL operating ratio remained the same quarter-over-quarter at 92.4%. During the quarter, our LTL segment experienced $1.8 million of additional sequential costs related to an abnormal increase of insurance costs, temporary costs incurred to assist our recently opened service centers, and increased employee costs due to one more payroll day. The $1.8 million of increased costs were partially offset by a $1.7 million contingent purchase price adjustment. The addition of Expedited Freight Systems (EFS) in August 2012 and the implementation of certain performance initiatives resulted in a net revenue margin improvement from 27.7% in the third quarter of 2012 to 28.5% in the third quarter of 2013.

TL revenues grew by $45.9 million, or 36.9%, from the prior year third quarter. Incremental revenues from our 2012 and 2013 acquisitions accounted for $32.3 million of the increase, with the remaining $13.6 million representing organic growth of 11.0% from our existing business. Our TL operating ratio improved to 93.6% in the third quarter of 2013 from 94.1% in the third quarter of 2012. TL revenues and operating costs in this year's third quarter were also negatively affected by sluggish economic conditions, increased costs associated with hours of service rules and a flat pricing environment. During the quarter, our TL segment also experienced $1.3 million of additional sequential costs related to an abnormal increase in insurance costs, lost productivity in drayage and warehousing due to port strikes and customer order system changes, and increased employee costs due to one more payroll day. Offsetting these increased costs was a $1.6 million contingent purchase price adjustment related to two acquisitions, whose revised forecasted performance yields lower future earn-out payments. The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 48.1% increase in our TL operating income quarter-over-quarter.

TMS revenue grew $27.0 million, or 112.6%, in the third quarter of 2013 from the prior year quarter, primarily due to our 2013 acquisitions of Adrian Carriers and Marisol International. This growth led to a 68.8% increase in TMS operating income quarter-over-quarter.

29.    On December 27, 2013, Roadrunner announced that Brian van Helden had been promoted to Chief Operating Officer. Defendant DiBlasi stated, "Brian has been instrumental in the company's growth and success over the past seven years and is uniquely qualified for this promotion. Brian has extensive operational experience both in the broader trucking arena and specifically in all aspects of Roadrunner's businesses. All operations will report directly to Brian over the long term. He will immediately assume direct leadership of our LTL operation." The

10

announcement further stated that as a result of van Helden's promotion, the following changes had been implemented at the Company:

> Pat McKay, President of Roadrunner Truckload Services, will take on an expanded role at Truckload Services and Intermodal Services. Kevin Charlebois, President of Prime Distribution Services, will continue to lead Roadrunner's freight consolidation operation and Roadrunner expects to expand his responsibilities over the next 12 months. In the near term, Mark DiBlasi will take a more active role in TMS management.

> Roadrunner intends to expand its overall sales management team through both internal promotion and hiring external talent to correspond with the significant growth Roadrunner has experienced over the past several years.

> Roadrunner expects these structural changes to lay the foundation for improved performance in the near and long term.

30.     The statements referenced above pertaining to Roadrunner's reported financial results and internal controls were each materially false and misleading when made because they failed to disclose and/or misrepresented material facts. Specifically:

(a)     Roadrunner's reported financial results disseminated during the Class Period violated GAAP and, collectively, materially overstated net income and materially misstated assets, revenues, net income and expenses. Roadrunner's reported financial results during the Class Period: (a) improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; (b) improperly accounted for Company expenses; and (c) improperly accounted for existing balance sheet accounts. As a result of these and other improper accounting transactions, Roadrunner's reported expenses were materially understated during the Class Period, its assets were materially overstated, and its reported revenue and net income were materially inflated. Defendants failed to disclose that the Company's financial statements were not stated in accordance with GAAP; and

11

(b)     The Individual Defendants' Sarbanes-Oxley certifications, and other statements pertaining to Roadrunner's internal controls during the Class Period, were false and materially misleading because, at the time the Individual Defendants signed or made the statements, they knew or recklessly disregarded that:  (1) the Company's reported financial statements violated GAAP; (2) the financial statements materially misstated assets, revenues, net income and expenses; and (3) there were material weaknesses in the Company's internal controls that rendered the Company incapable of ascertaining its true financial condition.

31.     On February 5, 2014, Roadrunner reported financial results for the three and twelve months ended December 31, 2013.  In discussing the Company's fourth quarter performance, Defendant DiBlasi stated:

> Although strong organic and acquisition-related revenue growth led to a 24.4% increase in 2013 fourth quarter revenues and a 21.6% increase in 2013 fourth quarter net revenues over the fourth quarter of 2012, our lower than expected diluted income per share in the fourth quarter of 2013 resulted primarily from the following major factors that affected all of our segments.  We experienced unfavorable claims developments during the fourth quarter of 2013, primarily related to increased accidents involving claims, accelerating costs on settled claims and, correspondingly, increased reserves on new claims.  This resulted in insurance and claims expense that was approximately $3.8 million greater than the prior year quarter, causing a $0.06 impact on diluted income per share.  Although our recently opened LTL terminals continued to perform well during the fourth quarter of 2013 and contributed to most of our LTL revenue growth during the quarter, these terminals have a lower freight density and net revenue margin as compared with our legacy terminals.  Additional costs incurred in our LTL segment due to lower freight density negatively impacted our fourth quarter diluted income per share by approximately $0.02.  Final valuations of definite-lived intangible assets related to our 2013 acquisitions of Marisol International and Adrian Carriers increased amortization expense by approximately $0.5 million, which negatively impacted our 2013 fourth quarter diluted income per share by $0.01.  Our freight consolidation business had startup costs related to a significant new customer award that continued beyond the normal startup period and additional costs incurred due to a third party customer order system issue.  The additional costs within our freight consolidation business negatively impacted our fourth quarter diluted income per share by $0.01.  Lastly, external factors such

12

as the severe weather experienced throughout the United States during the month of December and compliance with new hours of service rules impacted revenue growth and operational efficiencies across all of our segments, which negatively impacted our 2013 fourth quarter diluted income per share by $0.02. During the fourth quarter of 2013, the above noted factors were partially offset by net contingent earnout adjustments of $2.6 million related to prior acquisitions and a reduction in our effective tax rate from 38.8% for the fourth quarter of 2012 to 29.2% for the fourth quarter 2013 due to a permanent tax benefit related to contingent earnout adjustments.

LTL revenues grew by $5.7 million, or 4.4%, during the fourth quarter of 2013 from the prior year fourth quarter. Our LTL revenue growth over the prior year quarter was almost entirely attributable to our recently opened terminals. The revenue growth throughout our entire LTL network was negatively impacted by the severe weather experienced throughout the United States during the month of December. Our net revenue margin decreased from 28.1% in the fourth quarter of 2012 to 27.7% in the fourth quarter of 2013. This decline resulted primarily from the lower net revenue margin at our recently opened LTL terminals and load inefficiencies due to the December weather impacts noted above. We also incurred $2.3 million of additional expense in our LTL segment related to increased insurance claims and redundant dock costs related to new terminal freight. Until our recently opened LTL terminals can build sufficient density to send loads direct to the final destination, the new terminal loads will be combined with our legacy terminal loads resulting in double handling and redundant dock costs. These issues resulted in our LTL operating ratio deteriorating from 94.9% in the fourth quarter of 2012 to a 96.1% in the fourth quarter of 2013. We expect our organizational restructuring announced in late December and our continued efforts to upgrade our sales and safety/risk management personnel will drive LTL performance improvements from the fourth quarter 2013 level.

TL revenues grew by $36.7 million, or 25.6%, during the fourth quarter of 2013 from the prior year fourth quarter. Incremental revenues from our 2013 acquisitions accounted for $23.1 million of the increase, with the remaining $13.7 million representing 9.5% organic growth. Our fourth quarter revenues and operating costs in our TL segment were negatively affected by severe weather experienced throughout the United States during the month of December, sluggish economic conditions, increased costs associated with hours of service rules and a flat pricing environment. During the quarter, we also incurred $2.4 million of additional expense in our TL segment related to increased insurance claims, continuing startup costs related to a significant new business award, and a third party customer order system issue. These increased expenses were offset by a $1.5 million net contingent purchase price adjustment related to prior TL acquisitions, whose revised forecasted performance yields lower future earn-out payments. Our TL operating ratio deteriorated from 92.8% in the fourth quarter of 2012 to 93.6% in the fourth quarter of 2013 primarily due to the issues outlined above, as well as the addition of key management personnel to execute our

growth strategy, and a greater percentage of our TL revenue growth in truckload services and drayage, which have lower operating margins than our warehousing business. However, the positive impact of our recent TL acquisitions and organic revenue growth led to a 12.3% increase in TL operating income quarter-over-quarter.

TMS revenue grew by $30.9 million, or 130.0% during the fourth quarter of 2013 from the prior year fourth quarter, primarily as a result of our 2013 TMS acquisitions of Adrian Carriers and Marisol International. This growth led to a 35.9% increase in TMS operating income quarter-over-quarter. Final valuations of definite-lived intangible assets related to our acquisitions of Marisol International and Adrian Carriers resulted in increased amortization expense of approximately $0.5 million sequentially from the third quarter 2013 to the fourth quarter 2013.

Our consolidated revenue increased 26.8% to $1,361.4 million in fiscal 2013 from $1,073.4 million in fiscal 2012. This revenue growth was a combination of both organic- and acquisition related growth. Our consolidated operating income increased 23.8% to $85.4 million in fiscal 2013 from $69.0 million in fiscal 2012. Our consolidated net income available to common stockholders increased 30.6% to $49.0 million in fiscal 2013 from $37.5 million in fiscal 2012. Our diluted income per share available to common stockholders increased 11.2% to $1.29 in fiscal 2013 from $1.16 in fiscal 2012. Our December 2012 and August 2013 stock offerings increased the weighted average diluted shares outstanding for the year ended December 31, 2013 by 4.3 million shares and impacted diluted income per share by $0.16 from the prior year.

32.    On February 24, 2014, Roadrunner announced that it had acquired Rich Logistics, a provider of truckload and expedited services based in Little Rock, Arkansas. In addition, Roadrunner announced it had acquired Everett Transportation Inc. and certain assets of Keith Everett (collectively, "Everett"). The total enterprise value of the transaction was approximately $48 million. Rich Logistics transports product throughout the United States and Mexico utilizing a combination of independent contractors and employee drivers. Everett is a contractor operating exclusively for Rich Logistics. The acquisition was financed with borrowings under Roadrunner's credit facility. Defendant DiBlasi said, "Both Rich Logistics' and Everett's management teams will stay in place to help achieve the growth opportunities that we collectively envision." "Rich Logistics' operating network, service standards, and high quality

14

fleet are an excellent complement to our existing truckload services platform and will provide immediate growth opportunities within the segment," Brian van Helden, Roadrunner's COO, said. The press release stated that in 2013, Rich Logistics generated revenues of approximately $113 million and that Rich Logistics was expected to be accretive to Roadrunner's earnings in 2014.

33. On March 14, 2014, Roadrunner announced that it had acquired all of the outstanding stock of Unitrans International Corporation, a leading high-quality, non-asset based provider of international logistics solutions based in Los Angeles, California, for a total purchase price of $55.5 million, financed by borrowings under Roadrunner's credit facility. Defendant DiBlasi said, "As we have indicated, one of our key strategic objectives is expanding our international capabilities to meet our customers' total transportation and logistics needs. The addition of Unitrans diversifies and expands our existing global supply chain solution and brings a well-run company with a proven track record of high service quality to Roadrunner. … Unitrans has an excellent leadership team led by Andrew Schadegg and Chris Amberg. Andrew and Chris have been integral in defining Unitrans' strategy and shaping its culture, and will remain in place to help us realize growth in our international platform." The press release stated that in 2013, Unitrans generated revenues of approximately $84 million, and that Unitrans was expected to be accretive to Roadrunner's earnings in 2014.

34. On April 30, 2014, Roadrunner reported financial results for the quarter ended March 31, 2014. In discussing the company's first quarter performance, Defendant DiBlasi said, We were pleased with our first quarter results given the impact from severe winter weather throughout the quarter. Strong organic and acquisition-related revenue growth led to a 27.6% increase in 2014 first quarter revenues. Our first quarter operating income, excluding acquisition

transaction expenses of $0.4 million, improved 2.5% over the prior year quarter to $19.6 million.

Our first quarter EBITDA improved 6.6% over the prior year quarter to $24.0 million.

> LTL revenues grew by $2.3 million, or 1.7%, during the first quarter of 2014 from the prior year first quarter. Our LTL operating ratio deteriorated from 93.2% in the first quarter of 2013 to 95.0% in the first quarter of 2014. The primary factors contributing to the increased LTL operating ratio were additional costs incurred due to severe weather in the first quarter of 2014 and increased insurance and claims expense in the first quarter of 2014 compared to the first quarter of 2013.

> TL revenues grew by $47.3 million, or 32.3%, during the first quarter of 2014 from the prior year first quarter. Incremental revenues from our 2013 and 2014 acquisitions accounted for $27.8 million of the increase, with the remaining $19.6 million representing 13.4% organic growth. The positive impact of our recent TL acquisitions and organic revenue growth led to a 23.9% increase in TL operating income quarter-over-quarter. Our TL operating ratio deteriorated from 93.4% in the first quarter of 2013 to 93.8% in the first quarter of 2014. The primary factors contributing to the increased TL operating ratio were additional costs incurred due to severe weather in the first quarter of 2014 and increased insurance and claims expense in the first quarter of 2014 compared to the first quarter of 2013.

> TMS revenue grew by $35.2 million, or 164.1%, during the first quarter of 2014 from the prior year first quarter, primarily as a result of our acquisitions of Adrian Carriers, Marisol International, and Unitrans. The positive impact of our recent TMS acquisitions led to a 49.6% increase in TMS operating income quarter-over-quarter.

35. On July 9, 2014, Roadrunner announced that it had expanded the Company's existing credit facility to $550 million from $368 million through 2019. "This agreement is a testament to the confidence our banking partners have in Roadrunner," said Defendant DiBlasi. "The amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions. We are extremely pleased with the support of our bank group and look forward to continuing our relationship with such strong business partners."

36.     The statements referenced above pertaining to Roadrunner's reported financial results and internal controls were each materially false and misleading when made because they failed to disclose and/or misrepresented material facts.  Specifically:

(a)     Roadrunner's reported financial results disseminated during this period violated GAAP and, collectively, materially overstated net income and materially misstated assets, revenues, net income and expenses.  Roadrunner's reported financial results during the Class Period:  (a) improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; (b) improperly accounted for Company expenses; and (c) improperly accounted for existing balance sheet accounts. As a result of these and other improper accounting transactions, Roadrunner's reported expenses were materially understated, its assets were materially overstated, and its reported revenue and net income were materially inflated.  Defendants failed to disclose that the Company's financial statements were not stated in accordance with GAAP; and

(b)     The Individual Defendants' Sarbanes-Oxley certifications, and other statements pertaining to Roadrunner's internal controls during this period, were false and misleading because, at the time the Individual Defendants signed or made the statements, they knew or recklessly disregarded that:  (1) the Company's reported financial statements violated GAAP; (2) the financial statements materially misstated assets, revenues, net income and expenses; and (3) there were material weaknesses in the Company's internal controls that rendered the Company incapable of ascertaining its true financial condition.

37.     On May 8, 2014, the Company filed a Form 10-Q for the quarter ended March 31, 2014 ("Q1 2014 10-Q") with the SEC, which provided the Company's first quarter 2014

17

financial results and positions and stated that the Company's internal controls over financial reporting were effective as of March 31, 2014. The Q1 2014 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

38.    On July 21, 2014, Roadrunner announced that it had acquired Integrated Services, ISI Logistics and ISI Logistics South (collectively, "Integrated Services" or "ISI"), a regional logistics provider focused on the warehousing and transportation needs of customers, primarily the automotive industry, based in Kokomo, Indiana. The total purchase price was $13 million, and was financed with borrowings under Roadrunner's credit facility. The press release stated that in 2013, Integrated Services generated revenues of approximately $21 million and that Integrated Services was expected to be accretive to Roadrunner's earnings in 2014.

39.    On August 7, 2014, the Company filed a Form 10-Q for the quarter ended June 30, 2014 ("Q2 2014 10-Q") with the SEC, which provided the Company's second quarter 2014 financial results and stated that the Company's internal controls over financial reporting were effective as of June 30, 2014. The Q2 2014 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

40.    On November 6, 2014, the Company filed a Form 10-Q for the quarter ended September 30, 2014 ("Q3 2014 10-Q") with the SEC, which provided the Company's third quarter 2014 financial results and stated that the Company's internal controls over financial reporting were effective as of September 30, 2014. The Q3 2014 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

18

41.     On March 2, 2015, the Company filed a Form 10-K for the year ended December 31, 2014 ("2014 10-K") with the SEC, which provided the Company's fourth quarter 2014 and full year 2014 financial results. The 2014 10-K also stated that the Company's internal controls over financial reporting were effective as of December 31, 2014. The 2014 10-K was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

42.     On May 7, 2015, the Company filed a Form 10-Q for the quarter ended March 31, 2015 ("Q1 2015 10-Q") with the SEC, which provided the Company's first quarter 2015 financial results and positions and stated that the Company's internal controls over financial reporting wee effective as of March 31, 2015. The Q1 2015 10-Q was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

43.     On July 28, 2015, Roadrunner announced that it had acquired Stagecoach Cartage and Distribution, a provider of truckload and logistics services based in El Paso, Texas, for a total purchase price of $35 million, plus an earn-out capped at $5 million. Defendant DiBlasi said,

> Stagecoach is an extremely high-quality company with a broad service portfolio and an experienced and motivated management team that represents an excellent platform to expand our cross-border services. Stagecoach's strong presence within the El Paso and Laredo markets, coupled with the company's Mexican Operating Authority, provides us with immediately realizable growth opportunities created by the accelerating demand within the region.

Scott McLaughlin, President of Stagecoach, said,

> We're very excited to join Roadrunner. In order to achieve our growth potential, we sought to partner with a larger organization that had the resources and personnel that could assist us in accomplishing our goals. After meeting with several members of the Roadrunner team, it was clear that we shared a very

similar cultural and strategic vision.  Our organization is confident that as a part
of Roadrunner, we can meet and exceed our collective goals.

The press release stated that Stagecoach generated revenues of approximately $34 million during
the 12 months ended June 30, 2015, with EBITDA in excess of $7 million, and that Stagecoach
was expected to be accretive to Roadrunner's earnings in 2015.

44.     On August 3, 2015, the Company filed a Form 10-Q for the quarter ended June
30, 2015 ("Q2 2015 10-Q") with the SEC, which provided the Company's second quarter 2015
financial results and positions and stated that the Company's internal controls over financial
reporting were effective as of June 30, 2015.  The Q2 2015 10-Q was signed and certified under
the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the
financial statements and the effectiveness of internal controls.

45.     On September 28, 2015, Roadrunner announced that on September 24, 2015, the
Company expanded its existing credit facility to $700 million from $550 million through 2019.
"This agreement is a testament to the confidence our banking partners have in Roadrunner," said
Defendant DiBlasi.  "The amendment reflects the Company's strong capital position and
financial flexibility, providing an ongoing ability to drive growth organically and through
strategic acquisitions.  We are extremely pleased with the support of our bank group and look
forward to continuing our relationship with such strong business partners."

46.     On November 9, 2015, the Company filed a Form 10-Q for the quarter ended
September 30, 2015 ("Q3 2015 10-Q") with the SEC, which provided the Company's third
quarter 2015 financial results and stated that the Company's internal controls over financial
reporting were effective as of September 30, 2015.  The Q3 2015 10-Q was signed and certified
under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of
the financial statements and the effectiveness of internal controls.

47.     On March 1, 2016, the Company filed a Form 10-K for the year ended December 31, 2015 ("2015 10-K") with the SEC, which provided the Company's fourth quarter 2015 and full year 2015 financial results.  The 2015 10-K stated that the Company's internal controls over financial reporting were effective as of December 31, 2015.  The 2015 10-K was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

48.     On May 10, 2016, the Company filed a Form 10-Q for the quarter ended March 31, 2016 ("Q1 2016 10-Q") with the SEC, which provided the Company's first quarter 2016 financial results and stated that the Company's internal controls over financial reporting were effective as of March 31, 2016.  The Q1 2016 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

49.     On August 8, 2016, the Company filed a Form 10-Q for the quarter ended June 30, 2016 ("Q2 2016 10-Q") with the SEC, which provided the Company's second quarter 2016 financial results and positions and stated that the Company's internal controls over financial reporting were effective as of June 30, 2016.  The Q2 2016 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls.

50.     These statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) the Company lacked effective internal control over financial reporting; (2) the

Company's financial statements dating back to the beginning of 2014 overstated the estimated results of operations; (3) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables; (4) the Company's financial statements dating back to the beginning of 2014 were not reliable; and (5) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

**B.**     **The Truth Begins to Emerge**

51.     On November 10, 2016, Roadrunner filed a Form 12b-25 notification of late filing with the SEC. The Form 12b-25 stated in pertinent part:

### PART III
### NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

***Roadrunner Transportation Systems, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q")*** within the prescribed time period without unreasonable effort or expense for the reasons described below.

On November 4, 2016, during the preparation and review of the Company's quarterly compliance certificate required under its credit agreement, ***the Company identified a mistake in the calculation of its cash flow leverage ratio for the four quarters ended September 30, 2016***. Based on the corrected calculation, upon the delivery of the quarterly compliance certificate (required to be delivered by November 14, 2016), the Company would not be in compliance with its cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016 absent a waiver of such anticipated non-compliance by the required lenders under the credit agreement. Since discovering the mistake, the Company has been in ongoing discussions with U.S. Bank National Association ("U.S. Bank") and the other lenders under its credit agreement with respect to a waiver of the Company's anticipated non-compliance with, and any actual or potential event of default resulting from such anticipated non-compliance with, the cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016. As a result of those ongoing discussions and other related matters that have

22

required the attention of senior management and other key personnel, the Company could not, without unreasonable effort and expense, complete its financial statements for the three and nine months ended September 30, 2016 and related disclosures and, consequently, could not file its Q3 2016 Form 10-Q within the prescribed time period. The Company currently intends to file the Q3 2016 Form 10-Q within 5 calendar days of its prescribed due date.

As mentioned above, the Company is currently engaged in discussions with U.S. Bank and the other lenders under its credit agreement with respect to a waiver of the Company's anticipated non-compliance with, and any actual or potential event of default resulting from such anticipated non-compliance with, the cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016. Although the Company can provide no assurance, it expects to obtain such waiver from U.S. Bank and the required lenders within the permitted extension period. However, the failure to obtain such waiver could have a material adverse effect on the Company's liquidity and financial condition.

Emphasis added.

## C. **Additional Misstatements**

52.     On November 14, 2016, the Company filed a Form 10-Q for the quarter ended September 30, 2016 ("Q3 2016 10-Q") with the SEC, which provided the Company's third quarter 2016 financial results and stated that the Company's internal controls over financial reporting were effective as of September 30, 2016. The Q3 2016 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy of the financial statements and the effectiveness of internal controls. The statements made in the Q3 2016 10-Q were materially false and misleading for the reasons stated herein.

53.     Throughout the Class Period, Roadrunner repeatedly issued press releases, investor presentations and other communications describing Roadrunner's financial statements for shareholders to rely upon. However, as shown below, such statements were materially false and misleading, and caused the Company's share price to be artificially inflated.

### D. **The Truth Emerges**

54. On January 30, 2017, after the market closed, Roadrunner issued a press release, also attached as Exhibit 99.1 to the Form 8-K filed with the SEC announcing a restatement of the Company's prior period financial statements ("January 2017 Press Release"). The January 2017 Press Release stated in pertinent part:

FOR IMMEDIATE RELEASE

### ROADRUNNER TRANSPORTATION SYSTEMS ANNOUNCES RESTATEMENT OF PRIOR PERIOD FINANCIAL STATEMENTS

CUDAHY, WI - January 30, 2017 - Roadrunner Transportation Systems, Inc. ("Roadrunner") (NYSE: RRTS), a leading asset-light transportation and logistics service provider, announced today that on January 27, 2017 its Audit Committee, after considering the recommendation of management, concluded that, as a result of the information obtained to date in connection with an ongoing investigation described below, *the following financial statements and associated reports of Roadrunner's independent registered public accounting firm, Deloitte & Touche LLP, previously filed with the Securities and Exchange Commission ("SEC") should no longer be relied upon:*

- *the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2014;*

- *the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014, June 30, 2014, and September 30, 2014;*

- *the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015;*

- *the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015; and*

- *the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016.*

*Similarly, related press releases, investor presentations or other communications describing Roadrunner's financial statements for these periods should no longer be relied upon.*

In November 2016, Roadrunner was made aware of various potential accounting discrepancies at its Morgan Southern and Bruenger operating subsidiaries. In response, Roadrunner's Board of Directors immediately commenced an investigation of the discrepancies with the assistance of Greenberg Traurig, LLP, as outside counsel, and RubinBrown LLP, as forensic accountants. The investigation into these discrepancies is still ongoing; however, based on the investigation to date, Roadrunner has identified various accounting errors that it currently estimates will require prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million.

These errors principally relate to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables. As the investigation is ongoing, the estimated amount is preliminary and could change materially. The investigation to date has disclosed that the accounting discrepancies may also affect periods prior to the periods set forth above. Roadrunner has not yet completed its analysis, however, to determine which prior periods may be affected. In addition, Roadrunner has begun to undertake a significant effort to determine if similar discrepancies and internal control deficiencies impacted other operating entities that were not part of the investigation. Therefore, there may be additional accounting adjustments as a result of these efforts and such adjustments may be material.

In addition, in conjunction with the investigation, Roadrunner is reassessing its internal controls over financial reporting and its compliance programs. The result of this reassessment could lead Roadrunner to conclude that there were deficiencies in Roadrunner's internal controls over financial reporting that constitute material weaknesses and would therefore effect the conclusions regarding effectiveness previously expressed in Item 9A, Controls and Procedures, of Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015. Accordingly, management's report on internal controls over financial reporting as of December 31, 2015 and the associated report of Deloitte & Touche LLP should no longer be relied upon. Roadrunner is committed to maintaining an effective control environment and making changes needed to enhance effectiveness.

Roadrunner intends to amend its previously filed Annual Report on Form 10-K for the year ended December 31, 2015 and its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016 as soon as practicable, but it is not able to provide an estimated date for filings at this time. "We want our stockholders to know that providing confidence and transparency in our financial statements is of paramount importance, and we are

doing everything possible to ensure that these errors do not occur in the future," said Mark DiBlasi, Chief Executive Officer of Roadrunner.

Emphasis added.

55.     On release of the news, the Company's share price fell from a close on January 30, 2017, of $11.54 per share of Roadrunner common stock to a closing price on January 31, 2017, of $7.92 per share – a drop of approximately 33%.  The next day, the stock closed at 7.54 per share, and nearly two months later, on March 29, 2017, it closed at $6.34 per share.

### E.  <u>Loss Causation and Economic Loss</u>

56.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  As detailed above, when the truth about Roadrunner's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price.  The decline in Roadrunner's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

57.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Roadrunner's business, operations and financial condition, as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Roadrunner's common stock to be artificially inflated. Plaintiff and other Class members purchased Roadrunner's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

**F.  Scienter Allegations in Support of Exchange Act Violations**

58.     Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants.  Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Individual Defendants caused Roadrunner to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act.  Their conduct with respect to Roadrunner's statements was intentionally misleading and/or reckless with regard to the risk of investors being misled.

59.     Company insiders, including the Individual Defendants, were able to cash in on the Company's artificially inflated stock price by selling millions of shares of Roadrunner stock for more than $150 million during the Class Period.

(a)     During the Class Period, former Roadrunner Board Chair Scott Rued reported transactions involving sales of approximately 6.445 million shares for proceeds of

27

$159.2 million, including sales by several partnerships that collectively held approximately 37% of Roadrunner's outstanding stock. These sales accounted for approximately 45% of the total holdings indirectly held by Rued.

        (b)     Between May 20, 2013 and November 20, 2013, Defendant DiBlasi sold 134,382 shares of stock, representing approximately 59% of his holdings of common stock and exercisable options.

        (c)     On May 20, 2013, Defendant Armbruster sold 130,000 shares of Roadrunner stock, his single biggest sale of Roadrunner stock at any point, representing almost 50% of his holdings of common stock and exercisable options. Thereafter, between February 12 and February 17, 2015, Armbruster sold 59,852 shares of stock.

        (d)     The magnitude and timing of the sales of Roadrunner stock during the Class Period are highly probative of scienter.

      60.     The Individual Defendants' insider sales during the Class Period were highly suspicious, some of which were virtually at the height of Roadrunner's stock price during the Class Period, and were accomplished after having engaged in accounting manipulations which caused the Company to report expenses that were materially understated, assets that were materially overstated, and revenue and net income that were materially inflated during the Class Period. Defendants were not required to sell in the amounts or volumes that they did when they did, or at the prices at which they sold. The insider sales during the Class Period are also highly suspicious given the fact that the selling individuals are the top level officers and sold substantial majorities of their respective holdings. The Individual Defendants' insider sales with knowledge of material undisclosed facts during the Class Period were in flagrant violation of their duty under the federal securities laws to "abstain or disclose." These insider sales also constitute

28

significant evidence demonstrating that the Individual Defendants acted with actual knowledge or deliberate recklessness or otherwise had a motive to buoy or inflate the price of Roadrunner stock.

61.     For the reasons stated above, the factual allegations strongly support an inference of scienter on the part of Defendants.

**G. Presumption of Reliance; Fraud-on-the-Market**

62.     At all relevant times, the market for Roadrunner securities was an efficient market for the following reasons, among others:

(a)     Roadrunner securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

(b)     During the Class Period, Roadrunner securities were actively traded, demonstrating a strong presumption of an efficient market;

(c)     As a regulated issuer, Roadrunner filed with the SEC periodic public reports during the Class Period;

(d)     Roadrunner regularly communicated with public investors via established market communication mechanisms;

(e)     Roadrunner was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Many of the reports were also publicly available and/or otherwise entered the public marketplace; and

(f)     Unexpected material news about Roadrunner was rapidly reflected in and incorporated into the Company's stock price during and at the end of the Class Period.

29

63.     As a result of the foregoing, the market for Roadrunner stock promptly digested current information regarding Roadrunner from all publicly available sources and reflected such information in Roadrunner's stock price. Under these circumstances, all purchasers of Roadrunner common stock during the Class Period suffered similar injury through their purchase of Roadrunner's common stock at artificially inflated prices, and a presumption of reliance applies.

64.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Roadrunner.

**H.  No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

66.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-looking statements.

67.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Roadrunner who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Roadrunner common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

69.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Roadrunner securities were actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that

there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Roadrunner or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 11, 2016, Roadrunner had 38,340,326 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not hundreds of thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

70.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

71.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(b)     whether the Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Roadrunner securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Roadrunner securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

76.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that

33

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Roadrunner common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

77. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Roadrunner as specified herein.

78. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Roadrunner's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Roadrunner and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Roadrunner common stock during the Class Period.

79. Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives and/or director at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a

34

senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

80.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  The fact the Company restated its financial statements means that all pertinent information existed and was available to Defendants when they issued the false financial statements throughout the Class Period.  It further serves as an admission that the financial statements were materially false when issued.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Roadrunner's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

81.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Roadrunner's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Roadrunner's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Roadrunner's common stock during the Class Period at artificially high prices and were damaged thereby.

82.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Roadrunner's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Roadrunner common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

83.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

85. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of the stock giving rise to the cause of action.

## COUNT II

### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

86. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87. DiBlasi and Armbruster acted as controlling persons of Roadrunner within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, DiBlasi and Armbruster had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. DiBlasi and Armbruster were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

88. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

89. As set forth above, Roadrunner, DiBlasi and Armbruster each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

90. By virtue of their positions as controlling persons, DiBlasi and Armbruster are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

91. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e) Such other and further relief as the Court may deem just and proper.

38

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: March 30, 2017

Respectfully submitted,

**CROSS LAW FIRM, S.C.**

By: /s/ Nola J. Hitchcock Cross
    Nola J. Hitchcock Cross
    SBN: 1015817
    Mary C. Flanner
    SBN: 1013095
    The Lawyers' Building
    845 N. 11th Street
    Milwaukee, WI 53233
    (414) 224-0000 (phone)
    (414) 273-7055 (facsimile)
    mflanner@crosslawfirm.com
    njhcross@crosslawfirm.com

*Local Counsel for Plaintiff*

**BARRACK, RODOS & BACINE**
STEPHEN R. BASSER
SAMUEL M. WARD
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

and

JEFFREY A. BARRACK
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jbarrack@barrack.com

*Counsel for Plaintiff the Public Employees' Retirement System of Mississippi and the Proposed Class*

39